UNITED STATES of America, Appellee,

v.

Hernando ROBINSON,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Jorge ROBINSON, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Roberto ROBINSON,
Defendant, Appellant.

Nos. 86–2124 to 86–2126.

United States Court of Appeals,
First Circuit.

Heard Nov. 4, 1987.
Decided March 18, 1988.

Carmin C. Reiss, by Appointment of the Court, with whom S. Elaine McChesney and Bingham, Dana & Gould, Boston, Mass., were on brief, for defendant, appellant Hernando Robinson.

Robert L. Hernandez, Malden, Mass. by Appointment of the Court, for defendant, appellant Jorge Robinson.

Roxana Marchosky, Boston, Mass., by Appointment of the Court, for defendant, appellant Roberto Robinson.

Mitchell D. Dembin, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., Acting U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, BREYER and TORRUELLA, Circuit Judges.

BREYER, Circuit Judge.

On June 3, 1986, the United States Coast Guard stopped a Panamanian ship, the M/V JUAN ROBINSON, as it sailed about 500 nautical miles east of North Carolina. Coast Guard officers, boarding with the master's consent, looked around the ship, became suspicious, obtained Panama's permission to proceed further, and eventually found about 20 tons of marijuana hidden in a fake fuel tank. Subsequently, a jury convicted the appellants Hernando and Jorge Robinson of unlawfully possessing marijuana with intent to distribute it, 21 U.S.C. § 955a(c) (1982) (amended, recodified at 46 U.S.C. § 1903(a) and (c) (Supp. IV 1986)) and 18 U.S.C. § 2 (1982), and, along with appellant Roberto Robinson, of conspiring to do so. 21 U.S.C. § 955c (1982) (amended, recodified at 46 U.S.C. § 1903(j) (Supp. IV 1986)). All three appellants argue that principles of international, and of constitutional, law prevent the government from applying United States drug law to them; two appellants also question the sufficiency of the evidence. After examining the record and the relevant legal authorities, we conclude that their convictions are lawful.

I

Appellants' most important arguments focus upon 21 U.S.C. § 955a(c), a statute that, in part, forbids offshore drug possession. At first glance the statute does not seem to apply to the high seas, for it says that no "person on board any vessel *within the customs waters* of the United States" may knowingly "manufacture or distribute, or ... possess with intent to ... distribute, a controlled substance." (Emphasis added.) But a different statute, 19 U.S.C. § 1401(j) (1982), defines "customs waters" in a special way. With respect to any "foreign vessel" on the high seas, "customs waters" include "waters" within which "a foreign government" may "enabl[e] or permit[ ] the authorities of the United States to board, examine, search, seize, or otherwise to enforce ... the laws of the United States," as long as there is a "treaty or other arrangement" between the foreign government and the United States granting this permission. (See Appendix.) That is to say, if a foreign government "by treaty or other arrangement" permits the United States "to enforce [its laws] upon ... [a] vessel upon the high seas" the waters around the vessel become "customs waters," and 21 U.S.C. § 955a(c) then forbids drug possession. *See, e.g., United States v. Alomia–Riascos*, 825 F.2d 769, 770–71 (4th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 715, 98 L.Ed.2d 665 (1988); *United States v. Peterson*, 812 F.2d 486, 492–93 (9th Cir.1987); *United States v. Gonzalez*, 776 F.2d 931, 935–37 (11th Cir. 1985); *United States v. Bent–Santana*, 774 F.2d 1545, 1549–50 (11th Cir.1985); *United States v. Loalza–Vasquez*, 735 F.2d 153, 157 (5th Cir.1984); *United States v. Vouloup*, 625 F.Supp. 1266, 1267–68 (D.P. R.1985); *see also United States v. Charris*, 822 F.2d 1213, 1216–17 (1st Cir.1987) (validity of ad hoc arrangement assumed).

Appellants claim that this effort to extend the United States' criminal jurisdiction outside the boundaries of the United States violates international law; they add that Congress did not intend to exceed the bounds of international law; and they conclude that we must interpret the statute so that it does not apply to them. *See* S.Rep. No. 855, 96th Cong., 2d Sess. 2 (1980), U.S.Code Cong. & Admin.News 1980, p. 2785 (§ 955a would give Justice Department "the maximum prosecutorial authority *permitted under international law*") (emphasis added); H.R.Rep. No. 323, 96th Cong., 1st Sess. 9, 11 (1979) ("[statute] eliminates any possible conflict with international law by limiting the scope ... to situations where the United States has

clear jurisdiction"; "prohibit[s] all acts of illicit trafficking in controlled substances on the high seas which the United States can reach *under international law* ") (emphasis added); *see also Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) (Marshall, Ch.J.) ("an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains"); *Restatement (Second) of Foreign Relations Law of the United States* § 3(3) (1965) (same). They also claim that, regardless, the *ex post facto* clause of the federal constitution, art. I, section 9, clause 3, prohibits their convictions.

**A**

Appellants' "international law" argument rests upon the fact that, so far, most courts have found jurisdictional authority for applying § 955a(c) on the high seas in international law's "protective principle," a principle that "permits a nation to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security or could potentially interfere with the operation of its governmental functions." *United States v. Romero–Galue*, 757 F.2d 1147, 1154 (11th Cir.1985); *see also Alomia–Riascos*, 825 F.2d at 771; *Peterson*, 812 F.2d at 493–94; *Gonzalez*, 776 F.2d at 938–40; *Restatement (Revised) of Foreign Relations Law of United States* § 402 comment f (Tent. Draft No. 6, 1985) (hereinafter *Restatement (Revised)*). *But see Loalza–Vasquez*, 735 F.2d at 157. Appellants make the forceful argument that these courts are wrong.

Appellants concede that the "protective principle" allows the United States to forbid extraterritorial conduct aimed at its "security" or "against other important state interests," such as "conspiracy to violate the ... customs laws." *Restatement (Revised)* § 402 comment f; *see, e.g., United States v. Birch*, 470 F.2d 808 (4th Cir. 1972) (forgery of military papers), *cert. denied*, 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed. 2d 390 (1973); *United States v. Pizzarusso*, 388 F.2d 8 (2nd Cir.) (falsification on visa application), *cert. denied*, 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968); *Rocha v. United States*, 288 F.2d 545 (9th Cir.) (fraudulent entry to United States), *cert. denied*, 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed. 2d 1241 (1961). But, they ask, how can this principle justify prohibiting foreigners on foreign ships 500 miles offshore from possessing drugs that, as far as the statute (and clear proof here) are concerned, might be bound for Canada, South America, or Zanzibar? *See Restatement (Revised)* § 402(3) (protective principle gives state power to prescribe law protecting *itself* from actions taken abroad that harm *it* ); *id.,* comment f (protective principle "based on the effect ... [of an offshore] act *upon or in a state's territory* ") (emphasis added). *But see* 46 U.S.C. § 1902 (Supp. IV 1986) (finding in act amending § 955a that drug trafficking threatens security of United States).

Moreover, any assertion of jurisdiction under the protective principle must be "reasonable." *See Restatement (Revised)* § 403; Brown, "Protective Jurisdiction," 34 *Am.J.Int'l L.* 112, 114 (1940). How is it reasonable, they ask, to assert jurisdiction under these circumstances, particularly once one realizes that the "protective principle," as interpreted by the courts, might allow the United States to act even *without* the consent of the flag state. *See Alomia–Riascos*, 825 F.2d at 771; *Gonzalez*, 776 F.2d at 938; *Romero–Galue*, 757 F.2d at 1154.

Appellants go on to point out that the Convention on the Territorial Sea and the Contiguous Zones, *opened for signature* April 29, 1958, art. 24, 15 U.S.T. 1606, T.I.A.S. No. 5639 (entered into force Sept. 10, 1964), which the United States has signed, allows states to assert customs and immigration interests in a contiguous zone 12 miles offshore, not 500 miles offshore. *See also* Convention on the High Seas, *opened for signature* April 29, 1958, art. 6, 22, 23, 13 U.T.S. 2312, T.I.A.S. No. 5200 (entered into force Sept. 30, 1962) (describing limits of law enforcement on high seas); *Restatement (Second)* §§ 21, 22, 34 (same); *Restatement (Revised)* § 522 (same); I. Brownlie, *Principles of Public International Law* 254–55 (1979) (same). And,

they add, recently codified international law does not consider drug dealers to be like pirates, slave traders, or pirate broadcasters, against whom that law says any nation can assert its laws wherever they are found. *See* Convention on the High Seas, art. 22; *Restatement (Second)* § 34 & reporters' note 2; *Restatement (Revised)* §§ 404, 521 reporters' note 1, 522 & comment d & reporters' note 4 (drug ship can be seized only pursuant to formal or informal agreement).

■ In our view, however, appellants' arguments are beside the point, for there is another, different, but perfectly adequate basis in international law for the assertion of American jurisdiction. Panama *agreed* to permit the United States to apply its law on her ship. Panama's Director General of Consular and Shipping Affairs certified that on June 3, 1986, after the Coast Guard stopped the JUAN ROBINSON, the Panamanian government gave its "authorization" not only "to board, inspect, search, seize and escort the vessel to the United States," but also *"to prosecute the persons aboard the vessel."* It is clear, under international law's "territorial principle," that a "state has jurisdiction to prescribe and enforce a rule of law in the territory of another state to the extent provided by international agreement with the other state." *Restatement (Second)* § 25; *Vermilya–Brown Co. v. Connell*, 335 U.S. 377, 383–85, 69 S.Ct. 140, 143–45, 93 L.Ed. 76 (1948) (describing executive agreements transferring jurisdiction to United States); *United States v. Shiroma*, 123 F.Supp. 145 (D.Haw.1954) (American criminal jurisdiction over sovereign Japanese territory transferred by treaty); *see also Ex Parte Crow Dog*, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883) (United States can apply its pre-existing law to Indian nation by treaty without any further congressional action). Panama and the United States could agree to apply United States drug laws, say, in Panama City, should both nations wish to do so. *See, e.g., Dizon v. Philippines–Ryukus Command*, 81 Phil. Reports 286 (1948) (criminal jurisdiction over United States army base on Philippine territory can be ceded to United States by

agreement); *Miquiabas v. Philippines–Ryukus Command*, 80 Phil. Reports 262 (1948) (same). Similarly, they can agree to apply American law on a Panamanian ship.

Of course, the "agreement" here does not take the form of a treaty. But, nations may agree through informal, as well as formal, means. *See Restatement (Second)* § 115 & comment a (international agreement exists if manifest intention to define relationships under international law); *Restatement (Revised)* § 522 reporter's note 4 ("[a] ship suspected of [drug] traffic ... may be visited, inspected or seized by a foreign law enforcement ship ... pursuant to a formal or informal agreement"). In our view, the Panamanian statement giving the United States the right not only to board but "to prosecute" persons aboard the ship constitutes such an agreement. Panama, the only party who could object if the agreement was not so intended, *see United States v. Hensel*, 699 F.2d 18, 30 (1st Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983), has not indicated otherwise. These well-established principles, together with Panama's statement of agreement, are a sufficient answer to appellants' "international law" objections.

## B

■ Appellants' *ex post facto* argument is more difficult. In light of our concession that Panama's consent was necessary to apply American law, that law did not apply until sometime on June 3, 1986, sometime after the appellants' acts of possessing the marijuana were complete. Appellants argue that to apply American law to these previously completed acts violates the *ex post facto* clause of the Constitution, a clause which forbids Congress to enact any law " 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.' " *Weaver v. Graham*, 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325–26, 18 L.Ed. 356 (1867)); *see also Dobbert v. Florida*, 432 U.S. 282, 292–301, 97

S.Ct. 2290, 2297–2302, 53 L.Ed.2d 344 (1977); *Hopt v. Utah,* 110 U.S. 574, 588–90, 4 S.Ct. 202, 209–10, 28 L.Ed. 262 (1884). They say that American drug law imposes a worse punishment than Panamanian drug law, for it requires imprisonment far from home, *see Ex Parte Crow Dog,* 109 U.S. at 571, 3 S.Ct. at 406 (special injustice in trying Indian defendant according to "white man's" law), and it applies suddenly, after the event. Appellants' arguments have force; we have examined them carefully; yet ultimately they have failed to convince us for several reasons:

1. We have first considered the argument in light of the specific harms the *ex post facto* clause seeks to avoid. The Supreme Court summarized those harms in *Weaver:*

> Through [the *ex post facto* ] ... prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed. The ban also restricts governmental power by restraining arbitrary and potentially vindictive legislation.

450 U.S. at 28–29, 101 S.Ct. at 964 (citations omitted). We have not found these harms present here.

Plaintiffs cannot say that § 955a(c) fails to give them adequate *legal* notice. Enacted well in advance of their voyage, the Act makes clear that possession of drugs upon foreign flag vessels violates American law if the flag nation enters into an "arrangement" permitting the United States to "enforce" its laws "upon such vessel." Case-law makes equally clear that an "arrangement" can include the Coast Guard's ad hoc request for permission. *See, e.g., Peterson,* 812 F.2d at 492–93; *Bent–Santana,* 774 F.2d at 1549–50; *Loalza–Vasquez,* 735 F.2d at 157; *see also United States v. Marsh,* 747 F.2d 7, 9 (1st Cir.1984) (19 U.S.C. § 1581(h) "arrangement"); *United States v. Green,* 671 F.2d 46, 50–52 (1st Cir.) (same), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982); *United States v. Williams,* 617 F.2d 1063, 1077, 1089–90 (5th Cir.1980) (19 U.S.C. § 89 "arrangement"). Nor, if one looks to the particular facts of the case, can appellants claim that the circumstances in which the statute applies are unusual: Coast Guard stops and "sweeps" of vessels traveling in the Atlantic or Caribbean en route from South to North America are frequent and routine. H.R.Rep. No. 323 at 3, 4 ("now-familiar pattern" of Coast Guard drug stops and seizures occur "almost every other day" from Gulf of Mexico through Caribbean and north along Atlantic to Maine), and many of those stops involve Panamanian ships. *See, e.g., Bent–Santana, supra; United States v. Beltran,* 761 F.2d 1 (1st Cir.1985); *Romero–Galue, supra; Loalza–Vasquez, supra; United States v. Streifel,* 665 F.2d 414 (2nd Cir.1982); *Williams, supra.*

Nor can appellants claim they did not know drug possession was unlawful. Possessing drugs is as illegal under the laws of Panama as it is under the laws of the United States. Codigo Penal de Panama, tit. VII, ch. V, art. 255–58. In short, we cannot find any element of the crime of which appellants lacked legal notice in advance.

Neither can we find, *as far as advance notice is concerned,* any fundamental unfairness of a sort that the Constitution's "due process" clause might prohibit. In respect to warning, one might say that defendants freely embarked on a course of conduct that they knew could lead to criminal consequences under United States law. They loaded almost 20 tons of marijuana onto a ship registered in Panama, where they knew (or had legal notice) that such possession was prohibited, and they set forth on the high seas, an area where they knew (or had legal notice) that § 955a(c) applied and that forces out of their control —the Panamanian consul and United States law enforcement officers—might take mutual action "enabling or permitting the authorities of the United States ... to enforce upon ... [their] vessel ... the laws of the United States." (The term "customs waters," *by definition,* represents precisely the concerted decision of the United States and Panama to prosecute drug traffickers under American law.)

The statute told defendants about the risk of prosecution, and how the decision to prosecute would be made (the "arrangement" granting consent); prior practice told them that the United States would obtain foreign consent where possible. How then do these defendants differ from other criminal defendants who know that completing certain acts (here, embarking upon the high seas between Latin America and the United States, where agreement between Panama and the United States could bring the criminal consequences set forth in the American statute to bear) will make them liable to prosecution? Here, the manner of deciding *who* will prosecute the appellants is unusual. But, that is so for reasons of international law. That unusual method is written into the statute and does not affect "fair notice." *Cf. United States v. Starr*, 27 F.Cas. No. 16, 379 (C.C.D.Ark.1846) (extension of criminal jurisdiction *unlawful* where *no* pre-existing "prosecution-by-consent" arrangement). Of course, appellants could not tell, in advance, which legal authority would prosecute them or whether they would receive higher (U.S.) or lower (Panamanian) penalties. But their predicament in this respect is more like that of a defendant potentially subject to prosecution by several jurisdictions or uncertain of just what sentence a judge will impose than that of persons unaware that what they do at the time is unlawful or subject to particular penalties. That is to say, given the prior existence of statute and practice, we cannot find a "fair warning" problem sufficient to invoke *ex post facto* strictures.

Neither can we find any basis for a claim of a "vindictive" or "arbitrary" application of law. *Weaver*, 450 U.S. at 29, 101 S.Ct. at 964. The law was passed before the ship left port. It applies evenhandedly to all ships within its scope. It sets forth a clear procedure which the Executive must follow to enforce a clearly defined law, and there is no indication that the Executive has been enforcing that law in any arbitrary way. Statutes that make allowance for changing circumstances are not *per se* unlawful. *Cf.* Assimilative Crimes Act, 18 U.S.C. § 13 (1982); *United States v. Sharpnack*, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958) (changes in state criminal law made *after* the passage of the ASA may be "assimilated" into federal law, without further federal action). Nor is there anything unlawful about the Executive taking action to enlarge jurisdiction. *See, e.g., Vermilya–Brown, supra; Ex Parte Crow Dog, supra; Fleming and Marshall v. Page*, 50 U.S. (9 How.) 603, 614, 13 L.Ed. 276 (1850) (United States can extend boundaries "by the treaty-making power" or "legislating authority").

■ 2. We have not found any other fundamental conceptual principle of fairness that application of the statute here violates. Appellants argue that their conduct became unlawful under *American* law after it was too late for them to change. But, when otherwise fair, the Constitution's *ex post facto* and due process clauses do not *automatically* prohibit the application of *pre-existing* law to conduct known to be criminal *simply* because application of a particular law turns on a matter unknown to an offender or beyond his control. The passage of a gun in interstate commerce, for example, even before the enactment of the statute in question, can make a felon's receipt of that gun, later and without knowledge of or involvement in its previous interstate journey, illegal. *See* 18 U.S.C. App. § 1202(a) (1982); *United States v. Hopkins*, 529 F.2d 775, 777 (8th Cir.1976) (interstate transport before passage of Act by unrelated individual sufficient to convert felon's possession into *federal* crime), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977). The Travel Act makes certain violations of *state* law into *federal* offenses as soon as an offender trips an interstate connection, regardless, according to a number of courts, of the intent or knowledge of the offender in respect to *federal* law. *See* 18 U.S.C. § 1952 (1982 & Supp. IV 1986); *United States v. Sellaro*, 514 F.2d 114, 120–21 (8th Cir.1973) (*knowing* receipt of interstate telephone calls unnecessary for liability), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975). Similarly, a stolen vehicle must travel in interstate commerce

before its receipt can constitute a *federal* crime—but an in-state receiver need not have any knowledge of or connection with the vehicle's movement to be federally liable. *See* 18 U.S.C. § 2313 (1982 & Supp. II 1984); *Overton v. United States,* 405 F.2d 168, 169 (5th Cir.1968).

Consider, moreover, how the occurrence of an injury or death can make negligent conduct manslaughter, *see* 32 J. Nolan, *Massachusetts Practice* § 201 (1976) (gathering common law authorities); how the fact of age (even when unknown to a defendant) can create a statutory rape or convert a legal sale of alcohol into a prohibited sale to a minor, *see* Mass.Gen. Laws ch. 265 §§ 22A, 23 (1986); *Roberge v. Burnham,* 124 Mass. 277 (1878) (conviction under St. 1875, ch. 99, § 15, now replaced by Mass.Gen. Laws ch. 138 §§ 34, 34B); or, how a coconspirator can be liable for the actions of a colleague, a co-felon for the murder committed by a partner. *See, e.g., Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *Commonwealth v. Leavey,* 359 Mass. 744, 269 N.E.2d 209 (1971).

Consider *new* laws that prohibit possession of firearms by those convicted or dishonorably discharged before the law was passed, 18 U.S.C.App. § 1202(a), and note that Congress can enhance sentences for repeat offenders, even though doing so is, in a sense, to enhance the penalty for the first crime that took place before the enhancement statute was enacted. *Gryger v. Burke,* 334 U.S. 728, 732, 68 S.Ct. 1256, 1258, 92 L.Ed. 1683 (1948).

In all of these instances, facts outside defendant's knowledge or control can "complete" a crime, by contributing an essential element necessary for the offense. But in these instances, the courts have considered it fair, or at least not "unfair," constitutionally speaking, to find criminal liability. Once it is conceded that "fairness" is the issue, the law here is not unconstitutional, for, given prior notice and the basic unlawfulness (*i.e.,* under Panamanian law) of the appellants' primary (drug possessing) conduct, we cannot say, consti-

tutionally speaking, that it is "unfair" to apply § 955a(c) to them.

3. We have also looked for authoritative legal descriptions of the *ex post facto* clause to see whether those descriptions, if taken *literally,* might render the statute unlawful irrespective of the fact that it creates no specific *ex post facto* harm. The *Weaver* Court wrote:

> In accord with these purposes, our decisions prescribe that two critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.

*Weaver,* 450 U.S. at 29, 101 S.Ct. at 964 (footnotes omitted). The statute here is not "retrospective." It does not apply to "events occurring before its enactment." Nor does § 955a(c) "impose[ ] a punishment for an act which was not punishable at the time it was committed," *Weaver,* 425 U.S. at 28, 101 S.Ct. at 964 (quoting *Cummings,* 71 (4 Wall.) U.S. at 325–26, 18 L.Ed. 356), or "change the ingredients of the offense," *Hopt v. Utah,* 110 U.S. at 590, 4 S.Ct. at 210 any more than, say, the Hobbs Act, 18 U.S.C. § 1951 (1982), which makes punishable a grocery store robbery that *subsequently* affects interstate commerce. *See, e.g., United States v. Caldarazzo,* 444 F.2d 1046, 1049 (7th Cir.), *cert. denied sub nom. Delegge v. United States* 404 U.S. 958, 92 S.Ct. 328, 30 L.Ed.2d 276 (1971). Indeed, if one wishes to meet literalism with literalism, the crime here includes possession that continued *after* Panama gave its consent and American law applied. The real objection appellants raise is not to the failure to comply with the literal language of *Weaver* but rather to the "unfairness" of applying a law only when it is likely too late to change a course of conduct. But, for reasons pointed out above, we do not find significant unfairness in that fact here.

For these reasons, whether we consider the matter literally, conceptually, or in terms of the specific harms the *ex post*

*facto* clause seeks to prevent, we cannot find a violation of the Constitution.

## II

Two of the appellants, Jorge and Roberto Robinson, argue that the evidence was not sufficient to warrant their convictions for possession of marijuana and conspiracy. They concede that the Coast Guard found almost 20 tons of marijuana hidden in one of the vessel's fuel tanks; that someone had cut the fuel lines leading from the tank and capped them from inside the bulkhead; that someone had recently welded the tank closed and painted it; and that the Coast Guard found cans of matching paint on the ship and recently used welding equipment under the bunk of their codefendant Hernando Robinson. But, they say they knew nothing about any of this and that a reasonable juror could not conclude the contrary beyond a reasonable doubt. They point to cases holding that a person's "mere presence" on a ship containing drugs is insufficient evidence to support conviction, *United States v. Luciano Pacheco*, 794 F.2d 7, 10 (1st Cir.1986); *United States v. Quejada–Zurique*, 708 F.2d 857, 859 (1st Cir.), *cert. denied sub nom. Morejon–Ortega v. United States*, 464 U.S. 855, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983); *United States v. Smith*, 680 F.2d 255, 260 (1st Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983), and they add that most of our recent cases finding the evidence sufficient involved marijuana odors that the ship's crew likely smelled. *Charris*, 822 F.2d at 1215; *Luciano Pacheco*, 794 F.2d at 11; *United States v. Guerrero–Guerrero*, 776 F.2d 1071, 1074 (1st Cir.1985), *cert. denied sub nom. Mosquera v. United States*, 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986); *Beltran*, 761 F.2d at 5; *United States v. Del Prado–Montero*, 740 F.2d 113, 115 (1st Cir.), *cert. denied*, 469 U.S. 1021, 105 S.Ct. 441, 83 L.Ed.2d 366 (1984); *Quejada–Zurique*, 708 F.2d at 858.

■ The issue, of course, is not whether one particular indication of knowledge (such as a smell) did, or did not, exist. Rather, we must ask, looking at the evidence as a whole "in the light most favorable to the government," *Luciano Pacheco*, 794 F.2d at 10; *Beltran*, 761 F.2d at 5–6; *United States v. Patterson*, 644 F.2d 890, 893 (1st Cir.1981), and leaving to the jury the power to make any reasonable set of common sense assumptions about the working of human nature, *Guerrero–Guerrero*, 776 F.2d at 1075, whether a rational juror could find "no reasonable doubt." *Id.* Here, despite the absence of a characteristic marijuana odor, the evidence taken as a whole was sufficient to support the convictions.

First, most of the factors that courts in other cases have emphasized as supporting a finding that crew members aboard a vessel knew about the drugs are present here. These factors include "the close relationship of the crew, the length of the voyage and the large amount of marijuana on board." *United States v. Lopez*, 709 F.2d 742, 746 (1st Cir.), *cert. denied*, 464 U.S. 861, 104 S.Ct. 187, 78 L.Ed.2d 166 (1983); *see also Guerrero–Guerrero*, 776 F.2d at 1077 (also referring to "perceptibility of the marijuana"). In this case, the voyage was fairly long (about 17 days); the amount was large (nearly 20 tons); the ship of moderate size (150 feet); and the relationship between defendants and those with special reason to know about the marijuana arguably quite close (Jorge was the cousin of Hernando; Roberto's passport was found in a stateroom on the captain's deck, suggesting that he may have spent time there). *Compare Charris, supra* (7 days at sea, 75 foot vessel, 9,450 pounds marijuana); *Luciano Pacheco, supra* (8–9 day voyage, 55 foot vessel, 9,724 pounds marijuana); *Guerrero–Guerrero, supra* (16 day voyage, 317 foot vessel, 22,000 pounds marijuana); *Beltran, supra* (over 21 day voyage, 160 foot vessel, 44,000 pounds marijuana); *Del Prado–Montero, supra* (14 day voyage, "fishing" vessel, 57,265 pounds marijuana); *Loalza–Vasquez, supra* (6–7 day voyage, 75–80 foot vessel, 35,937 pounds marijuana); *Quejada–Zurique, supra* (over 8 day voyage, 60 foot vessel, 22,000 pounds marijuana).

In addition, the ship appeared to have no legitimate purpose for its voyage; it was a "mudboat," a vessel that normally supplies oil rigs in the Gulf of Mexico, yet it was found near Bermuda. The boat had just reversed its course (Roberto Robinson claimed the captain had just decided to head for Brazil instead of his previous destination of Canada because of electrical problems). The jury also might have believed that the ship had 9 crewmembers so that there were enough to help load the marijuana when the ship stopped in Colombia; and it might have disbelieved Jorge and Roberto's testimony that they were away from the ship at the time. *See Lopez,* 709 F.2d at 747.

Certain special facts about each defendant also pointed towards guilt. Jorge was the ship's "second engineer." He was supposed to make certain the ship had enough fuel. The jury might have thought that a "second engineer" would likely know what was in the fuel tanks, or would at least have noticed that the fuel level in the measuring tubes on the fake tank was "impossibly high" (as a Coast Guard officer described it). The jury might have disbelieved Jorge's claim that he was supposed to check only one of the 11 fuel tanks and thus knew nothing about the one with marijuana. The jury might also have considered Jorge's false statement, made to a Coast Guard officer, that the fake tank contained diesel fuel, and it might have thought the false statement a sign of guilt. *See Luciano Pacheco,* 794 F.2d at 10–11; *Lopez,* 709 F.2d at 747; *Quejada–Zurique,* 708 F.2d at 861; *Smith,* 680 F.2d at 260.

Roberto was a helmsman, who had previously spent over 11 years and made over 500 trips as a seaman. The government introduced evidence that he had previously been convicted for possessing marijuana on board a ship with intent to distribute it in the United States. Given the evidence that he knew about marijuana and his long experience as a professional sailor, the jury might reasonably have believed that Roberto would know the significance of the numerous suspicious circumstances—the lack of cargo, the unusual destination, the loading stop in Colombia, the impossibly high

fuel tube levels, the freshly welded and painted fuel tanks—and would have had no part of the voyage if innocent.

The jury might also have taken account of the fact that a navigation chart found open on the bridge carried an erased line leading from Bermuda (where the Coast Guard stopped the ship) to Cape Cod. It might have thought that Roberto, the helmsman when the boat was stopped, likely knew of the line (or at least the Captain did not mind if Roberto found out about it); that the line meant that Roberto and others who claimed the ship's destination was not the United States but Canada were lying; that Roberto knew of their deception; and that this knowledge suggested guilt. Finally, the jury might have found Roberto's statement that on 500 previous trips he had never asked about the cargo not only incredible but inconsistent with his statement that he thought the M/V JUAN ROBINSON carried "black oil"—all of which the jury might have taken as further signs of guilt.

This evidence and these inferences, taken together, add up to considerably more than "mere presence" on a drug-carrying ship. They amount at least to as much evidence as we found sufficient, *"regardless* of whether the marijuana was hidden in scent as well as sound,"* in *Charris,* where there was no convincing legitimate purpose for the boat's journey or its course, 9 crew members were aboard where 5 would have been sufficient, several of the defendants had had previous involvement with marijuana, and one defendant had responsibility as an engineer. *Charris,* 822 F.2d at 1219–20 (emphasis added); *see also Lopez, supra* (review under "grossly unjust" standard revealed "substantial evidence of participation" despite lack of odor considering stop-over in Colombia, navigating duties of one defendant, evidence that "spontaneous hiring" story of crew false, large quantity of marijuana, large number of crew); *Loalza–Vasquez, supra* (no mention of perceptibility of marijuana, evidence sufficient where voyage of 6–7 days in small vessel with 36,000 pounds marijuana, vessel made

radical change in course upon approach by Coast Guard).

Those cases where courts have reversed convictions for insufficient evidence have involved considerably less evidence than was present here. *See, e.g., United States v. Elkins,* 774 F.2d 530 (1st Cir.1985) (travel of defendants on small vessel with oversized tanks and overstocked food "might [have] constitute[d] sufficient evidence to support a verdict of guilty," despite legitimate reason for vessel's journey, lack of evidence of close captain/crew relationship, lack of prior involvement of defendants with drug smuggling *but for* reversible error in trial; case remanded); *United States v. Bland,* 653 F.2d 989 (5th Cir. Unit A) (evidence insufficient to convict crew members of tugboat towing barge in which marijuana hidden and crew member aboard ship meeting tugboat, where no circumstances that linked crew to marijuana or indicated illegitimacy of voyage to crew), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981); *United States v. Willis,* 639 F.2d 1335 (5th Cir. Unit A 1979) (similar lack of circumstances from which knowledge of crew could be inferred); *United States v. Mehtala,* 578 F.2d 6 (1st Cir.1978) (50 pounds of marijuana found in wake of ship with legitimate purpose for voyage, defendant was marine biology student sharing cabin with captain); *United States v. Francomano,* 554 F.2d 483, 486 (1st Cir.1977) (same ship, defendants not professional crew members but "young men, short of funds, seeking travel for educational experience and adventure").

For these reasons, the judgement of the district court is

*Affirmed.*

## APPENDIX

§ 955a.  Manufacture, distribution, or possession with intent to manufacture or distribute controlled substances on board vessels

### Vessels within customs waters of United States

(c) It is unlawful for any person on board any vessel within the customs waters of the United States to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

§ 1401.  Miscellaneous

When used in this subtitle or in Part I of Subtitle II of this chapter—

### Customs waters

(j) The term "customs waters" means, in the case of a foreign vessel subject to a treaty or other arrangement between a foreign government and the United States enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce upon such vessel upon the high seas the laws of the United States, the waters within such distance of the coast of the United States as the said authorities are or may be so enabled or permitted by such treaty or arrangement and, in the case of every other vessel, the waters within four leagues of the coast of the United States.