**JAMES H. CRAGGS CONSTRUCTION COMPANY, Appellant,**

v.

**Hugh G. KING et al., Appellees.**

**No. 17869.**

United States Court of Appeals
Fifth Circuit.

Jan. 26, 1960.

S. B. Lippitt, Albany, Ga., William V. Chappell, Jr., Ocala, Fla., for appellant.

Paul A. Keenan, Jr., Watson and Keenan, Albany, Ga., Reuben A. Garland, Atlanta, Ga., for appellees.

Before RIVES, Chief Judge, and HUTCHESON and CAMERON, Circuit Judges.

CAMERON, Circuit Judge.

The sole question presented by this appeal is whether there was sufficient evidence before the court below to support the verdict of the jury in favor of appellee King awarding damages for the breach by appellant Craggs of a hauling contract. King, plaintiff below, brought this action in a state court of Georgia for expenses and loss of profits resulting from an alleged breach of a subcontract entered into between him and appellant James H. Craggs Construction Company,

defendant below, the prime contractor under a government contract covering construction work at Turner Air Force Base, Georgia. Craggs removed the case to the District Court, filed an answer and counter claim against King and his surety, United States Fidelity and Guaranty Company, which Craggs brought in as an additional party.[1] This appeal is from a judgment rendered upon jury verdict in favor of King and against Craggs in the sum of $15,000, which judgment has the effect of denying recovery upon Craggs' counter claims against King and the United States Fidelity and Guaranty Company.[2]

Although the record contains some seven hundred printed pages and the exhibits are numerous and the briefs cover a wide range of arguments, the basic contentions of the parties are relatively simple. King contends that he had a contract, partly written and partly oral, to haul all of the concrete and the base aggregate with which Craggs would construct certain runways and taxi-ways for the government; that the agents of Craggs in charge of the work near Albany, Georgia refused to respect or perform plaintiff's contract, but on the other hand set about to run him off of the job soon after he began work upon it, also refusing to pay him for the work he had done. Craggs claims that its contract with King was entirely in writing, that many of the provisions King contended for and now seeks to enforce were bottomed upon agreements King claimed to have made with defendant's agents in charge of the work, who had no authority to amend or add to the contract; and it denied that it ran plaintiff off of the job, claiming, on the other hand, that plaintiff wrongfully quit his work and took his trucks away, causing defendant damages aggregating $27,954.39.

The case was submitted to the jury under the charge of the court below, which is not contained in the record, the jury returned a verdict in plaintiff's favor, and defendant claims here that there was no evidence upon which the verdict could legally rest and that its motion for directed verdict made at the close of plaintiff's evidence and repeated after all of the evidence was in, and its motion for judgment notwithstanding the verdict should have been granted.

Craggs, on April 29, 1958, entered into a written contract with the United States of America for the "Construction of Runway and Taxiway, FY–58." Said government contract was referred to in a number of documents and in the testimony, but it was not offered in evidence.

About May, 1958, Craggs, a Florida corporation, through J. R. Fitzgerald, its vice president, and D. B. Murphree, its field engineer, conducted negotiations with King which culminated in a written contract dated August 21, 1958, the salient features of which are reproduced in the margin.[3] Plaintiff charged that

---

1. United States Fidelity & Guaranty Company filed a cross claim against appellee King upon which a consent judgment was entered in the court below in King's favor, and this is not involved in this appeal.

2. For simplification King will be referred to herein as plaintiff, and Craggs as defendant.

3. The contract recited that Craggs was desirous of securing King's services to
 "Perform all hauling of base aggregate and concrete batching in connection with the Construction of Runway and Taxiway - FY58, Contract No. Da-09-133-ENG.-3292, Serial No. ENG.-09-133-58-4, Turner Air Force Base, Albany, Georgia;" and that King was "desirous of undertaking said construction according to plans and specifications, special provisions and any change order applicable thereto."
 The contract thereupon provided in these words that King should perform the services listed for the compensation provided:
 "Hauling base aggregates at a unit price of twenty-two cents ($0.22) per ton.
 "Hauling concrete batches (of coarse aggregate, fine aggregate and cement) at a unit price of twenty-five cents ($0.25) per ton.
 "It is mutually understood between both parties that the quantities to be involved in this subcontract are to be

the written contract covered only a portion of the agreement between the parties and that other features were added or the initial ones explained by supplemental oral agreements and by dealings between the parties as the work progressed.

 At the extended trial seventeen witnesses testified and more than a dozen exhibits were introduced in evidence, all without objection on either side. Craggs contends simply that there was not sufficient evidence to support a jury finding in favor of King. A careful reading of the record leads us to disagree with this position, and it is necessary to set out at some length the evidence favorable to King which the jury was justified in accepting. In sifting this evidence from the vast amount contained in the record it will be helpful to assemble it as it relates to the grounds King asserts as constituting the basis of his claim of a breach of his contract.

It should be kept in mind that negotiations between Craggs and King began in May, 1958, and that the parties all thought then that the work under discussion would be begun at a fairly early date. June 18th, Craggs submitted to King a writing purporting to set out the agreement between the parties, which brought on much more discussion and some changes in the written contract before it was executed August 21st. One of the main points discussed throughout the whole period of the dealing of the parties was *the base rate of pay which King would receive for his hauling.*

The written contract provided only that King should haul base aggregates "at a unit price of twenty-two cents ($0.22) per ton," and "concrete batches (of coarse aggregate, fine aggregate and cement) at a unit price of twenty-five cents ($0.25) per ton." King contended throughout that this price was based upon and was dependent upon the distance of the respective hauls, and he had David B. Murphree, Jr., engineer in charge of construction for Craggs, write him a letter dated July 4, 1958,[4] and introduced evidence of substantiating conversations, both before the contract was signed and during its abortive execution, between King on the one side, and Fitzgerald, Craggs' vice president, Lavender, its superintendent in the field, and Murphree, its project engineer on the other.

total quantities as covered by the contract unless an adjustment is mutually agreed upon by both the Contractor and Craggs.

"It is agreed and understood that any and all extra work or changes which may arise during this undertaking will be with written change order issued by Craggs authorizing such work or such changes and Craggs shall not be chargeable for any work performed by Contractor [King] without such written authorization having been delivered to Contractor."

It was thereupon provided that King "shall furnish and have the sole responsibility for the supervision and control of all labor, parts, fuel, machinery and equipment necessary for, or incidental to properly commencing and completing said construction."

Provisions were inserted requiring King to carry insurance, pay all taxes, social security, etc., and to furnish bond and " * * * to furnish adequate equipment and personnel to perform the work covered by this contract, at such time and in such a manner, so as not to impair the scheduled progress of the job."

Craggs promised to do only two things: pay for the work and construct necessary roads:

"VI. Payment for work performed by Contractor will be made to Contractor within five (5) calendar days after monies for said work are received by Craggs from the Corps of Engineers, U. S. Army.

"VII. It is further understood and agreed that Craggs will perform the following services as related to said construction:

"Construct and maintain necessary haul roads."

4. "Dear Mr. King:

"This will confirm our conversation regarding the hauling of base material aggregate and concrete material batches on the above captioned project.

"Our agreement was that the base material would be approximately a two mile haul and that the concrete material approximately a two and one half mile haul.

"The approximate tonnage on base material is 140,000 Ton. The approximate tonnage on the concrete aggregate is 110,000 Ton."

Murphree pointed out to King on the ground where the roads to be constructed by Craggs would run. Craggs did not build the roads along the routes so indicated, but so located them that the closest hauls, according to measurements made between Murphree and King in the latter days of their dealing, was 3.4 miles, and the longest was 4.10 miles. King complained constantly and fervently to Murphree and also to Lavender and Fitzgerald that he could not make any of the hauls over the longer routes at the price mentioned in the contract, and these representatives of Craggs merely temporized with him, telling him that due adjustment would be made to cover the added distances. As the product, in part, of these constant arguments, in which Fitzgerald at one time "raked Murphree over the coals" in a telephone conversation in King's presence, Murphree developed and demonstrated a dislike for King which dominated his actions in his dealings with King.

As background for the dealings during the crucial period from September 5th to October 5, 1958, should be considered a letter written by Murphree in the name of James H. Craggs Construction to King dated September 5, 1958, which is reproduced in the margin.[5] The letter was written on a day when Murphree and King were having conversations at the performance site of the contract; and, following conversations already in progress and upon receipt of the letter, King moved onto the performance site September 8th, taking his house trailer in which he lived until the cessation of

performance activities about October 1st. King took to the site with him at that time seven trucks suitable for hauling the base aggregate and had more than double that number ready to move in when needed.

Despite the constant pleading of King, Murphree never did agree definitely to pay any more for the additional distance until the break-up between the parties was in process of consummation, at which time he agreed to allow three cents more per ton than the written contract called for.

The character of the roads provided was made the subject of protest by King, who claimed that he had been assured that most of the haul would be upon paved roads, whereas the roads provided were rough and not kept up and were in such condition that one or more trucks turned over with considerable damage to King and those whom he employed to assist in the performance of the hauling contract.

Related to the matter of distance as an item in arriving at the amount King would be paid by Craggs was the matter of the method by which weights were to be determined. The written contract called for payment of so much per ton. Murphree and King discussed whether they would accept the weights fixed by the railroads which would haul the base aggregate to the premises, or would weigh each truck and truckload to determine the net weights. After considerable hauling had been done Murphree wrote King a letter[6] dated September

---

5. "Dear Mr. King:

"In the course of our telephone conversation of 2 September 1958 you assured me you would come to Albany the next day to discuss the arrangement of compartments in your trucks for the batch hauling on subject contract and matters pertaining to the hauling of the aggregate base material.

"I informed you we would be ready to start hauling the base material on 8th September 1958.

"Our concrete operations are scheduled to start the week of September 15th,

1958 and it will be necessary that you have your batch trucks on the job site and inspected and approved by the Corps of Engineers prior to that time.

"*Your lack of interest leaves us in doubt as to whether you will be able to perform your contract with us.*

"In view of the situation as it now stands, it is imperative that you be at our Albany Office on the morning of 8th September 1958 to clear this matter up." [Emphasis supplied.]

6. The letter was mailed to King at Fort Gaines, Georgia, as were practically all

16th in which he advised: "From information furnished by the Corps of Engineers we will arrive at the weight of material per inch, for each square yard. Borings by the Corps will give us an average thickness for the entire job. * * * We feel that this is the most accurate and satisfactory manner in which to compute the tonnage." This meant that King was to be paid, not on the basis of *weight* ascertained in the usual way, but on the basis of cubic measurement after the aggregate had been put in place and compacted by heavy machinery. King testified that this change would reduce his income from the contract by about forty per cent.

Another feature not covered by the contract was the amount of materials which King would haul on his trucks when the hauling of batch material should begin. Murphree advised him that he would be limited to two and one-half tons per truck. This would mean that the trucks would be operated at about half their capacity.

King and the subcontractors he had brought there to haul "batch" had busied themselves over the period from September 8th to about October 1st hauling the base aggregate and 1872 loads were hauled for which King never received any payment. King produced testimony that Murphree had assured him that the trucks would be kept busy ten hours per day and six days per week. The failure of Craggs to have the aggregate materials brought in by railroad on schedule produced a situation where the haulers were able to keep busy only a fraction of that time. King made an effort to give them extra work by buying and tearing down a house and beginning construction of a shop upon the contract site; but nevertheless during this period the men King had brought to the job were able to keep busy only a small portion of the time.

*The hauling of concrete batching (consisting of coarse aggregate, fine aggregate and cement)* was the subject of greatest controversy between Craggs and King and furnished the final occasion for the breach between them. The written contract between the two made no mention of how the batch would be loaded into King's trucks. But all of the proof showed that the loading was to be done by Craggs, which purchased in California and installed on the contract site, two loading units for depositing batch in the trucks. A truck would drive under the first unit, which would deposit in it coarse aggregate and fine aggregate and pull up a short distance to the second unit where sand and cement would be dropped into the trucks.[7] A special type of truck was required having three compartments and the trucks owned by King were not suitable for hauling batch.

King arranged with Davis, represented by Adams, to furnish trucks with three compartments which had been engaged generally in the hauling of batch. Three of these trucks were brought to the contract site, and Murphree measured and examined them carefully and stated that, in his opinion, they were exactly what was required to do the job properly.

Having been advised by Murphree's letter, footnote 6 supra, that the batch plant would be ready to operate the week of September 15th and that the trucks must be on hand prior to that time, King arranged with Adams to have thirteen of these trucks, deemed by both of them to be suitable and adequate, upon the camp site on September 13th; and seven more were available at a nearby point if they should be needed. There was testimony that trucks of this character were rented in the open market at from ten to fifteen dollars per hour. The batch plant was not completed until September 29th, and was not in fact put into operation until October 1st. Adams and his

---

of the other communications, although Murphree and King were in contact many times each day and Murphree knew that King was resident upon the contract premises.

7. The time factor in these operations became the subject of much conversation between the parties, but the details will not be set out, as this was a minor factor in their disagreements.

trucks remained on hand ready to work until October 1st, but were never permitted to haul a load of batch. They hauled base aggregate in small quantities, but the proof showed that Adams had been forced to an outlay of about three thousand dollars to pay the haulers, who were largely idled during the period.

Representatives of the Government were not satisfied with the Adams trucks, feeling that a can or wooden receptacle should be installed in one of the compartments to carry the cement. Adams and King were entirely willing to make these installations, and Murphree told Adams to go ahead and begin the hauling of batch, inasmuch as his trucks had theretofore proven adequate for the purpose, and if a trial period of about three weeks did not satisfy the government representatives, the additional installation of cans could then be made. Somewhere along the line Murphree made overtures to Adams to employ him and his trucks direct, despite the fact that Adams was subcontractor of King.

In the meantime one of Craggs' employees told King of a man named Drossner, of Miami, who had trucks fully equipped to haul on government jobs, including the cans for the cement; and, with Murphree's knowledge, King called Drossner and arranged with him to bring his trucks to Albany and haul batch for him. Several telephone conversations between the two ensued and Murphree was kept advised of the negotiations and arrangements.

Meantime Craggs sent from its office at Gainesville, Fla. to King, care of Craggs Construction Company in Albany Ga., a telegram which Murphree personally delivered to King at his trailer home. Its impact upon the breach between the parties warrants its full reproduction.[8] This telegram was sent when Craggs knew of the presence of a sufficient number of the Adams trucks to do the job and of the arrangements being consummated between King and Drossner. The contract called only for equipment which was "adequate" and there was ample proof that the Adams trucks were adequate. Nevertheless King went forward with the plans to employ Drossner.

Drossner arrived with some of his trucks September 25th. He went to King and advised King in a peremptory manner that he was looking for somebody with big money which he could get hold of without any delay. Before King could get in his words Drossner departed and went to see Murphree who, without consultation with King, paid Drossner $500. In keeping with his practice of making a written record of his dealings with King, Murphree wrote King under date of September 26th,[9]

---

8.

 "9–19–58

"James H. Craggs Construction
 Company
"P. O. Box 1282
 "Albany, Georgia
"Attention Mr. H. G. King
"Reference is made to our Letters of 9–5–58 and 9–16–58. This is to advise that we Expect Adequate Approved Batch Trucks on Job Site not Later than 12:00 Noon 9–20–58. Failure to Comply will automatically put you in Default of your Contract with us and your Bonding Company will be Requested to take Necessary Corrective Action.
 "James H. Craggs
 Construction Company."

This telegram was, as stated, sent from Craggs' home office, but it referred to two of Murphree's letters to King, and it was sent after the home office had been kept conversant by Murphree with what was transpiring on the contract site.

9. "Clause 5 of your contract with us states as follows:
 " 'Contractor agrees to furnish adequate equipment and personnel to perform the work covered by this contract, at such time and in such manner, so as not to impair the scheduled progress of the job.'
"This has not been complied with in regards to the concrete batch hauling portion of your contract.
"You have ignored our requests and instructions in our letter of 16th. September and our telegram of 19th September, 1958.
"On the 25th. of September, 1958, Mr. Erwin Drossner contacted me and states that he had brought five batch trucks up from Miami, as the result of a telephone

sending the letter, not to King's trailer where he knew King was present, but to Fort Gaines, Georgia.

There were other items in controversy between Murphree and King, but the foregoing will suffice to illustrate the happenings which led Adams and King to take their equipment away from the contract site. It might be mentioned that King had bought several thousand dollars worth of tires and spare parts for his trucks, and testified that he had been forced to pay out from nine to ten thousand dollars during the time of his sojourn there, and that all of the trucks brought there by him and by Adams were idle eighty per cent of the time during the three or four weeks they were waiting for the batch plant to get ready for operation and for arrival of the base aggregate. The arrival of Drossner signaled the end of King according to his testimony, a portion of which is reproduced in the margin.[10]

Drossner began to haul batch on October 1st under arrangements made entirely between him and Murphree, without any further contact with King. Adams and King agreed that Adams would send one of his trucks under the batch-loaders and try to get in on the hauling. At the time both Lavender and Murphree were standing on the platform above where the Adams truck parked. The first batch-loading machine dumped some aggregate into the Adams truck, whereupon someone yelled from the platform where the two officials were standing and told the truckdriver to pull away and go and unload the aggregate. This was done. Later, King tried to talk with Lavender and the latter "cursed me out and told me what he was going to do, going to beat me and put me in jail, going to impound all my trucks." On October 1st, Adams left with his trucks and a few days later King pulled out with his. Between the two 1,872 loads of base ag-

conversation he had had with you several days before.

"However, Mr. Drossner and the owners of the other four trucks were not satisfied with your operations. Namely, the fact that they saw no effort on your part to have any of your own trucks for batch hauling, and the fact that you offered no financial assistance to them until such time that they would have some income.

"Mr. Drossner informed me that all five trucks would have to return to Miami the night of September 25th, unless an advance of $500.00 could be arranged.

"Not being able to find you on the job, we advanced the $500.00 requested and were assured by Mr. Drossner that he would have his batch trucks at our plant site ready for work at 7:00 A.M. September 29th, 1958.

"This $500.00 is to be deducted from your first estimate and in turn will be deducted from amount due Mr. Drossner on his batch hauling.

"I have talked with Mr. Bill Pace of Ventulett & Pace on two occasions in regards to your contract and have requested that he meet with me the morning of September 29th, to discuss this situation more thoroughly."

The men mentioned in the last paragraph of the letter were representatives of the surety company on King's bond.

10. "Well, it was on the day after Drossner arrived [on Sept. 25th] between 12 and 12:30 noon. Mr. Murphree drove up within about 15 feet of my house trailer that I was living in and I came outside and asked him, the first words that were said, I spoke to him and I asked him when he was going to get started hauling batches, because Mr. Adams had been to me wanting to know when he could haul.

"* * * so I asked Mr. Murphree the first thing when he drove up when he could start. He said, 'You're out of it altogether'. That was the first words he said after speaking to me. I asked him, I said, 'What do you mean?' He said, 'I sent you a telegram last Saturday for you to have adequate batch trucks on the base and I don't feel that you complied with that telegram, and on Monday morning I took your contract away from you, and then yesterday I traded with Drossner.' * * *

"* * * He told me he had taken the contract and given it to Drossner. Well, then I told him that he'd have to pay me for all my expenses and my profit that I would make if he was going to take it and give it to Drossner. He said, 'Hell, no. You are not going to get a damn thing out of it.' So I said, 'Well, that can't be'. I said, 'I have a written contract.' He said, 'Well, that's the damn way it's going to be.' I said 'Well, we'll see about it.' And he drove off."

gregate had been hauled for which no payment has ever been made.

We think the evidence outlined justified the jury in finding that Craggs had breached its contractual relationship with King and that King was justified in pulling out with his equipment and in filing this civil action. The damages allowed by the jury were amply proved.

The case, as reflected by the record, is one essentially of fact with very little law involved.[11] The efforts of Craggs to disavow the actions of Murphree and Lavender, its ranking agents and its sole representatives at the point where the contract was being performed, are, in our opinion, wholly without merit. Besides having and exercising full control over all of the operations with respect to which King contracted with Craggs, Murphree wrote twelve letters to King and the surety company, most of which were placed in evidence by Craggs. In addition, King was in direct contact with the officials of Craggs at its home office on a number of occasions and Murphree talked with them in King's presence. Neither Lavender nor any corporate official of Craggs took the witness stand. We repeat that all of the evidence on both sides was introduced without any objections as to competence under the claim that the statements and agreements made and the actions taken were incompetent, because they had the effect of varying, altering or amending the terms of the written instrument. We are not called upon to decide, therefore, any question concerning the evidence which would be admitted to put us as nearly as possible in the position of the contracting parties, cf. T. B. Walker Manufacturing Co. v. Swift & Co., 5 Cir., 1912, 200 F. 529, or what part of the

evidence, if any, ought to have been excluded under the parol evidence rule, cf. Major Appliance Co. v. Hupp Corp., 5 Cir., 1958, 254 F.2d 503; Baker v. Nason, 5 Cir., 1956, 236 F.2d 483; Petroleum Financial Corp. v. Cockburn, 5 Cir., 1957, 241 F.2d 312; and Fidelity-Phenix Fire Ins. Co. v. Farm Air Service, Inc., 5 Cir., 1958, 255 F.2d 658.

It is plain that, as tried in the court below and presented to us, the case is typically one of fact. The jury chose to accept King's version of the multitudinous dealings between him and Craggs' agents. It is clear that it was justified in so doing. Finding no error in the action of the court below, the judgment appealed from is

Affirmed.

11. It is provided in 7 Code of Georgia Annotated, § 20–1104: "If the nonperformance [of a contract] is caused by the act or fault of the opposite party, that excuses the other party from performance." And the same Code provides, § 20–903: "In case of concurrent conditions to be simultaneously performed, if one party offers to perform and the other will not, the first is discharged from the

performance of his part, and may maintain an action against the other."

And cf. Austell Bank v. National Bondholders Corp., 188 Ga. 757, 4 S.E.2d 913; Day v. Jeffords, 102 Ga. 714, 29 S.E. 591; McCoy v. Scarborough, 73 Ga.App. 519, 37 S.E.2d 221; and Fitzgerald Cotton Oil Co. v. Farmers Supply Co., 3 Ga.App. 212, 59 S.E. 713.