T-Peg v. Timber Works                    CV-03-462-SM  02/09/05

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


T-Peg, Inc. and Timberpeg
East, Inc.,
      Plaintiffs

      v.                                    Civil No. 03-462-SM
                                            Opinion No. 2005 DNH 017
Stanley J. Isbitski, Vermont
Timber Works, Inc. and
Douglas S. Friant,
      Defendants


**O R D E R**


      T-Peg, Inc. and Timberpeg East, Inc. (collectively

"Timberpeg") have sued in eight counts, asserting claims of:

copyright infringement against Stanley Isbitski[1], Vermont Timber

Works, Inc. ("VTW"), and Douglas Friant (Counts I, II, and VIII);

breach of contract against Isbitski (Count III); unjust

enrichment against Isbitski and VTW (Counts IV and V); unfair

competition against VTW (Count VI); and violation of the New

Hampshire Consumer Protection Act against VTW (Count VII).  Those

_____

      [1] Plaintiffs named Isbitski as a defendant in their original
complaint, filed a voluntary stipulation for dismissal of
Isbitski on June 1, 2004 (document no. 22), and have named him as
a defendant in their amended complaint, filed October 26, 2004
(document no. 39).  Isbitski has not appeared, and appears never
to have been served.

claims arise out of VTW's alleged use of Timberpeg's copyrighted architectural plans to build a timber frame for Isbitski. Defendant Friant is one of the two owners of VTW. Before the Court are: (1) VTW's motion for summary judgment on Counts II, V, VI and VII (document no. 23); (2) Timberpeg's cross-motion for summary judgment on the issue of copying, as it relates to Count II (document no. 25); (3) VTW's motion to strike portions of Timberpeg's objection to summary judgment (document no. 29); (4) VTW's motion for judgment on the pleadings in which it seeks dismissal of Counts V, VI, and VII and all claims for damages (document no. 33); and (5) VTW's motion for summary judgment on Count II on grounds of non-copyrightability and lack of profits related to the alleged copyright infringement (document no. 44). While the court obviously must rule on each of the five motions before it, the balance of this order is organized by count, rather than by motion.

**The Legal Standard**

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P.

2

56(c). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986)).

"The role of summary judgment is to pierce the boilerplate of the pleadings and provide a means for prompt disposition of cases in which no trial-worthy issue exists." Quinn v. City of Boston, 325 F.3d 18, 28 (1st Cir. 2003) (citing Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)).


"Once the movant has served a properly supported motion asserting entitlement to summary judgment, the burden is on the nonmoving party to present evidence showing the existence of a trialworthy issue." Gulf Coast Bank & Trust Co. v. Reder, 355 F.3d 35, 39 (1st Cir. 2004) (citing Anderson, 477 U.S. at 248; Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). To meet that burden the nonmoving party, may not rely on "bare allegations in [his or her] unsworn pleadings or in a lawyer's brief." Gulf Coast Bank & Trust, 355 F.3d at 39 (citing Rogan v. City of Boston, 267 F.3d 24, 29 (1st Cir. 2001); Maldonado-Denis

3

v. Castillo-Rodriquez, 23 F.3d 576, 581 (1st Cir. 1994)). When ruling on a party's motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 37 (1st Cir. 2003) (citing Rivera v. P.R. Aqueduct & Sewers Auth., 331 F.3d 183, 185 (1st Cir. 2003)).

## Background

T-Peg, Inc. owns a family of companies that "promote, design, manufacture and sell TIMBERPEG® brand post and beam home packages." (Pls.' Obj. to Summ. J., Ex. A (Pattison Aff.) ¶ 2.) Timberpeg East, Inc. and Timberpeg Services, Inc. are members of the Timberpeg family of companies. (Pattison Aff. ¶ 3.)

> Timberpeg East, Inc. is a wholly owned subsidiary of T-Peg, Inc., and is responsible for sales of TIMBERPEG® product[s] in the northeast United States. Timberpeg Services, Inc., also a wholly owned subsidiary of T-Peg, Inc., provides design, drafting and manufacturing services to Timberpeg East as well as other related Timberpeg companies operating in regions other than the northeast.

(Pattison Aff. ¶ 4.)

4

In late 1999, Stanley Isbitski began discussions with Timberpeg East concerning the possibility of purchasing a Timberpeg package. On November 1, 1999, he executed a "Deposit Agreement for TIMBERPEG® Preliminary Plans and Drawings." (Def.'s Mot. Summ. J., Ex. 7.) The terms of that agreement include the following:

> 3. Company [Timberpeg East] will furnish Customer with sets of Preliminary Plans. Such Plans will include: basement plan, floor plans, four (4) elevations, and a typical building cross section. Construction Plans, including foundation plans and details and including details of our standard construction techniques, will be supplied after the Preliminary Plans have been approved in writing. These Construction Plans may be used for planning the construction process, ordering materials, obtaining contractor bids, and securing a building permit. In some jurisdictions the Preliminary Plans may suffice for this purpose.

> 4. **Final Plans**, which include the frame design, will **not** be prepared as a part of the Deposit contemplated by this Agreement. Final Plans will be prepared as part of the contract for purchase of a Package and will be available prior to the shipment of the Package.

> . . .

> Company and/or its assigns owns and will continue to own the copyright in the Plans [including preliminary, construction, and final plans]. The Plans may be used

5

by Customer solely in connection with the evaluation and construction of one (1) Package purchased from Company. Any other use of the Plans, including, but not limited to, the following, is an unauthorized appropriation of copyright by Customer and a breach of this Agreement: a) the copying of all or any part of the Plans; b) the utilization or partial utilization of the Plans for the construction of a similar building or structure; or c) any transfer or delivery of the Plans to another person without written authorization from Company.

(Def.'s Mot. Summ. J., Ex. 7 (emphasis in the original).)

On December 29, 1999, Timberpeg East provided Isbitski with a set of preliminary plans (hereinafter "first preliminary plans"). (Pls.' Obj. to Summ. J., Ex. D (Cole Aff.) ¶ 2.)

After consulting with Isbitski, Timberpeg East presented him with a second set of preliminary plans on April 20, 2001. (Cole Aff. ¶ 3.) The second set of preliminary plans consisted of five sheets: (1) a cover page; (2) a sheet titled "first floor plan;"[2] (3) a sheet titled "second floor plan;" and (4) two sheets titled "elevation," each containing two elevation drawings. (Def.'s

---

[2] The first floor plan depicts a house and a garage, connected by a covered breezeway.

6

Mot. Summ. J., Ex. 1.) The house depicted in the second set of preliminary plans is fifty-two feet by forty-four feet and appears to have timber framing throughout (Def.'s Mot. Summ. J., Ex. 1 at 2), but the second set does not include any drawings of the frame design (Def.'s Mot. Summ. J., Ex. 12 (Vincent Aff.) at 97-99).

Timberpeg registered the second set of preliminary plans with the United States Copyright Office, effective May 18, 2001 (id. at 5), and, at some point, Isbitski filed a copy of the second set with the Salisbury Building Department (Cole Aff. ¶ 6). At about the same time it produced the second set, Timberpeg produced additional plans for Isbitski's house that were not submitted to the Copyright Office. (Vincent Dep. at 78-79.) Those plans included a preliminary isometric, showing a frame that utilized "two purlin frames with common rafters," (id. at 80), a framing system that is different from a so-called "bent system" (id.). In a memorandum dated May 2, 2001, Timberpeg East's regional manager, Lynn Cole, noted: "Stan [Isbitski] has asked for one significant change. He wants to change the timber frame in the main house (a P20K8-44' + 8' shed) from our standard

7

Purling frame (main purlin / secondary Rafters) to a Bent type frame w/main rafters & secondary purlins." (Def.'s Mot. Summ. J., Ex. 9A.)

Based upon continued discussions with Isbitski, Timberpeg revised the second set of preliminary plans, and on September 19, 2001, provided him with construction plans. (Cole Aff. ¶ 4.) While the construction plans called for a bent-style frame (id.), they, like the second set of preliminary plans, did not include frame drawings.[3] (Cole Aff., Ex. 1.) The constructions plans were not registered with the Copyright Office. Timberpeg never produced final plans for Isbitski, and thus, never provided him with a frame design. Isbitski did not purchase a package from Timberpeg.

While he was negotiating with Timberpeg, Isbitski was also negotiating with Vermont Timber Works ("VTW"), a company that designs and builds timber frames. (Def.'s Mot. Summ. J., Ex. 17

---

[3] The absence of frame drawings is consistent with Timberpeg's policy of providing a frame design as part of the final plans rather than as part of the preliminary plans or the construction plans. (See Def.'s Mot. Summ. J., Ex. 7.)

(Friant Aff.) ¶ 1.) Isbitski's initial meeting with VTW was in December, 2000. (Def.'s Mot. Summ. J., Ex. 16 (Hentschel Aff.) ¶ 4.) At that meeting, Isbitski showed Kim Hentschel, VTW's Director of Sales and Marketing, Timberpeg's first preliminary plans, which indicated that the Timberpeg design utilized a primary purlin - secondary rafter system, rather than the bent system Isbitski preferred. (Hentschel Aff. ¶ 7.) Isbitski either took the Timberpeg plans with him after his meeting with Hentschel, or left them with her for, at most, "a couple of days." (Hentschel Aff. ¶ 4.) Hentschel has no recollection of ever seeing the copyrighted second set of preliminary plans at any time before March 6, 2004. (Hentschel Aff. ¶ 13.)

Doug Friant, VTW's sole designer and draftsman, was also present at Isbitski's initial meeting with VTW. (Friant Aff. ¶¶ 1, 4.) Friant perused Isbitski's Timberpeg plans (i.e., the first preliminary plans) but did not examine them carefully because they employed a purlin-rafter design, rather than the bent design Isbitski wanted. (Friant Aff. ¶ 4.) Friant has testified that he did not use the first preliminary plans in any way in designing a frame for Isbitski, and never saw the

9

copyrighted second set of preliminary plans until after the start of this litigation. (Friant Aff. ¶¶ 9, 10.)

On March 8, 2002, Isbitski agreed to purchase a VTW bent-system timber frame. (Cole Aff. ¶ 11.) Between February and May, 2002, Friant designed a bent-system frame for Isbitski's residence, and produced a series of seven shop drawings consisting of: (1) one sheet titled "Perspectives;" (2) one sheet titled "Post Layout;" (3) one sheet titled "2nd Fl Framing/Roof Framing; (4) one sheet titled "Bent Profiles;" (5) one sheet titled "Line Profiles;" and (6) two sheets titled "Details." (Def.'s Mot. Summ. J., Ex. 2.) The frame depicted in the VTW shop drawings measures approximately twenty-eight feet by forty-four feet. (Def.'s Mot. Summ. J., Ex. 2 at 2.) In June, 2002, VTW erected the timber frame depicted in Friant's shop drawings on Isbitski's property. (Friant Aff. ¶ 12.) VTW did not provide Isbitski with anything other than a timber frame. (Friant Aff. ¶ 14.) Isbitski never finished the house.

Lynn Cole discovered that a timber frame had been erected on Isbitski's property, and that the second set of preliminary plans

prepared by Timberpeg had been placed on file at the Salisbury Building Department, prompting Timberpeg to file this suit.

**Discussion**

A.  Count II

In Count II, Timberpeg asserts that: (1) "Vermont Timber improperly copied the Plans or caused them to be copied without Timberpeg's authorization" (Am. Compl. ¶ 44); (2) "Vermont Timber improperly utilized the Plans or caused the Plans to be utilized in the manufacture of a timber frame and the assembly of that timber frame for the Isbitski House" (Am. Compl. ¶ 45); and (3) "[t]he Isbitski House, which incorporates Vermont Timber's timber frame, which timber frame is aesthetically and structurally integral to the Isbitski House, is substantially similar to the architectural work embodied in the Plans" (Compl. ¶ 46).[4]  VTW moves for summary judgment, arguing that: (1) there is no

_____

[4] While Timberpeg asserts in its complaint that the Isbitski house is substantially similar to the house depicted in the second set of preliminary plans, it shifts position in its objection to summary judgment, arguing that "VTW's frame constitutes an unlawful copy of Timberpeg's architectural work reflected in Timberpeg's copyrighted architectural plans." (Pls.' Obj. to Summ. J. at 12.)

11

evidence of direct copying; (2) there is no evidence that it had access to the copyrighted work; (3) VTW's timber frame is not substantially similar to the architectural work embodied in the second set of preliminary plans; (4) "buildings" are protected by copyright, but "other structures" are not; and (5) Timberpeg East is not a copyright owner.

"To prevail on a claim of copyright infringement, the plaintiff must show both ownership of a valid copyright and illicit copying." Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 33 (1st Cir. 2001) (citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); Matthews v. Freedman, 157 F.3d 25, 26-27 (1st Cir. 1998)).

The element of copying is established by means of a two-part test. Yankee Candle, 259 F.3d at 33.

> First, a plaintiff must prove that the defendant copied the plaintiff's copyrighted work, either directly or through indirect evidence. Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 60 (1st Cir. 2000). Second, "the plaintiff must prove that the copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works 'substantially

> similar.'" <u>Id.</u>; <u>see also</u> <u>Skinder-Strauss Assocs. v.</u>
> <u>Mass. Continuing Legal Educ., Inc.</u>, 914 F. Supp. 665,
> 672 (D. Mass. 1995) ("Even evidence of actual copying
> may be insufficient, however, if this copying was not
> substantial.").

<u>Id.</u> (footnote omitted).

Indirect evidence of copying will suffice, if a plaintiff presents "evidence that the alleged infringer had access to the copyrighted work and that the offending and copyrighted works are so similar that the court may infer that there was factual copying (i.e., probative similarity)." <u>CMM Cable Rep, Inc. v.</u> <u>Ocean Coast Props., Inc.</u>, 97 F.3d 1504, 1513 (1st Cir. 1996) (quoting <u>Lotus Dev. Corp. v. Borland Int'l, Inc.</u>, 49 F.3d 807, 813 (1st Cir. 1995)).

Regarding the second prong of the test for copying, substantial similarity:

> Whether there is substantial similarity between
> copyrightable expressions is determined by the
> "ordinary observer" test. <u>Concrete Mach. Co. v.</u>
> <u>Classic Lawn Ornaments</u>, 843 F.2d 600, 607 (1st Cir.
> 1988). "The test is whether the accused work is so

13

> similar to the plaintiff's work that an ordinary
> reasonable person would conclude that the defendant
> unlawfully appropriated the plaintiff's protected
> expression by taking material of substance and value."
> Id. (quoting Educ. Testing Servs. v. Katzman, 793 F.2d
> 533, 541 (3d Cir. 1986)).

Yankee Candle, 259 F.3d at 33.

As a preliminary matter, plaintiff's theory "that VTW's frame constitutes an unlawful copy of Timberpeg's architectural work reflected in Timberpeg's copyrighted architectural plans" (Pls.' Mem. of Law at 12) is legally incorrect. It is well established "that a building is not a 'copy' of the underlying plans, with the result that construction of the structure does not constitute infringement." 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 2.08[D][2][a] at 2-125 (2004 (Rel. 63, Apr. 2004)). "A person cannot, by copyrighting plans, prevent the building of a house similar to that taught by the copyrighted plans . . . ." Robert R. Jones Assocs., Inc. v. Nino Homes, 858 F.2d 274, 280 (6th Cir. 1988) (quoting Herman Frankel Org. v. Tegman, 367 F. Supp. 1051, 1053 (E.D. Mich. 1973)). Thus, "one may construct a house which is identical to a house depicted in copyrighted architectural plans, but one may not directly copy

14

those plans and then use the infringing copy to construct the house."  Jones, 858 F.2d at 280.


Hunt v. Pasternack, 179 F.3d 683 (9th Cir. 1999), a case on which plaintiffs rely, is not to the contrary.  While the opinion in Hunt explains that "[t]he House Report, in its explanation of the effective date provisions, also makes clear that an unconstructed work, embodied only in plans or drawings, can be infringed by a structure that embodies the copied design," id. at 685-86 (citing H.R. REP. No. 101-735, at 23 n.53, reprinted in 1990 U.S.C.C.A.N. at 6954), the opinion also states that "[t]he only issue that we must decide is whether the district court erred as a matter of law in ruling that a valid copyright in an architectural work can subsist only in a work that has been constructed," id. at 684 (emphasis added).  Thus, the court in Hunt did not consider whether a building can constitute a copy of an architectural work.


Because the timber frame VTW built cannot be a copy of the architectural work embodied in Timberpeg's copyrighted second set

of preliminary plans, the only potentially infringing copy in this case is the set of shop drawings Friant drafted.

As there is no direct evidence of copying, plaintiff's claim rests on indirect evidence. While the parties disagree on the access element, the court assumes that VTW had access not only to the first, but also to the copyrighted second set of preliminary plans, based on the undisputed fact that Isbitski had possession of those plans. See Rottlund Co. v. Pinnacle Corp., No. Civ.01-1980 DSD/SRN, 2004 WL 1879983, at *21 (D. Minn. Aug. 20, 2004) (quoting Kootenia Homes, Inc. v. Reliable Homes, Inc., No. 00-1117, 2002 WL 15594, at *5 (D. Minn. Jan. 3, 2002) ("Plaintiff may prove access by showing that a third person with creative input for the designer has had access to the copyrighted work")) (other citations omitted); see also Arthur Rutenberg Corp. v. Parrino, 664 F. Supp. 479, 481 (M.D. Fla. 1987) (quoting Kamar Int'l, Inc. v. Russ Berrie & Co., 657 F.2d 1059, 1062 (9th Cir. 1981) (quoting NIMMER ON COPYRIGHT, § 13.02[A] at 13-11 (1981))).

But even assuming VTW had access to the copyrighted second set of preliminary plans, plaintiff's infringement claim fails

16

because the allegedly infringing work, VTW's shop drawings, lack probative similarity to the second set of preliminary plans. That is, the second set of preliminary plans and VTW's shop drawings are not "so similar that the court may infer that there was factual copying." CMM Cable Rep, 97 F.3d at 1513 (citation omitted). The second set includes no frame drawings. The VTW shop drawings depict nothing other than a timber frame. The second set consists of four elevations and two floor plans, which include locations for timber posts. The VTW shop drawings include no elevations, and the closest thing to a floor plan in the shop drawings is a sheet titled "Post Layout." However, plaintiff's own expert has testified that of the twenty-seven posts in the VTW frame, twenty-five have a different size, shape, location, orientation, or notching from the equivalent post in the Timberpeg floor plan.[5] (Def.'s (second) Mot. for Summ. J.

----

[5] More specifically: (1) two of the VTW posts have no equivalent in the Timberpeg floor plan; (2) four of the VTW posts are of a different size than the corresponding Timberpeg posts; (3) four of the VTW posts have different locations than the corresponding Timberpeg posts; (4) four of the VTW posts are oriented differently than the corresponding Timberpeg posts; (5) two of the VTW posts have different notching than the corresponding Timberpeg posts; (6) two of the VTW posts are not continuous while the corresponding Timberpeg posts are; (7) one of the VTW posts differs from the corresponding Timberpeg post in both location and notching; (8) one of the VTW posts differs from the corresponding Timberpeg post in both location and size; (9)

(document no. 44), Ex. 29 (Vincent Dep. II) at 57-69 and Ex. 30.) In short, the VTW shop drawings do not bear any probative similarity to the second set of preliminary plans beyond the reality that both relate, generally, to houses with the same basic dimensions. Thus, defendants did not copy Timberpeg's copyrighted second set of preliminary plans.

Even had VTW copied the second set, Timberpeg's infringement claim would still fail because the allegedly infringing shop drawings are not substantially similar to the second set of preliminary plans. "In the words of Judge Learned Hand, two works are substantially similar if 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same.'" Concrete Machinery, 843 F. 2d at 607 (quoting Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960); citing Ideal Toy Corp. v. Fab-Lu Ltd., 360 F.2d 1021, 1022 (2d Cir. 1966)). Here, because the two sets of plans are

---

five of the VTW posts differ from the corresponding Timberpeg posts in both size and shape; and (10) two of the VTW posts are identical to their Timberpeg counterparts in size, shape, location, orientation, notching, and continuousness. (Def.'s (second) Mot. Summ. J., Ex. 30.)

fundamentally different kinds of drawings, the ordinary observer is faced not with the detection of differences, but with the detection of similarities, which are few. Timberpeg produced elevations and floor plans; VTW did not. VTW's shop drawings depict a timber frame; Timberpeg produced no frame drawings. Only two of the twenty-seven posts in VTW's "Post Layout" drawing have the same characteristics (size, shape, etc.) as the corresponding posts in the Timberpeg floor plan. The copyrighted second set of preliminary plans and the VTW shop drawings may suggest the same style house, but that does not make the two sets of drawings substantially similar. "Substantial similarity . . . refers only to the expression of the artist's concept, not the underlying idea itself; mere identity of ideas expressed by two works is not substantial similarity giving rise to an infringement action." Concrete Machinery, 843 F.2d at 606 (citing 17 U.S.C. § 102(b); Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp., 672 F.2d 607, 615 (7th Cir. 1982); Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 547 (1985)).

19

It may well be that VTW designed – and drew plans for – a timber frame that would support a house just like that depicted in the Timberpeg floor plans and elevations. But, for purposes of a copyright infringement action, VTW's alleged retro-fitting, or reverse engineering, does not render VTW's shop drawings a copy of Timberpeg's floor plans and elevations. "An artist 'can claim to "own" only an original manner of expressing ideas,' not the ideas themselves." Concrete Machinery, 843 F.2d at 606 (quoting Cooling Sys. & Flexibles v. Stuart Radiator, 777 F.2d 485, 491 (9th Cir. 1985)). Here, what is shared by the Timberpeg floor plans and the VTW shop drawings is the idea of a twenty-eight by forty-four foot part of a house, with a stair bay located in a particular position. While Timberpeg's particular expression of that idea is protected by copyright, that protection does not prevent everyone else from expressing those same ideas in an entirely different way, as VTW did in its shop drawings. VTW's shop drawings are just another way of expressing an idea – the layout of the house Isbitski wanted to build – not a copy of Timberpeg's expression of that idea. Accordingly, even if VTW did just what Timberpeg accuses it of doing, looking at the second set of preliminary plans and then designing a frame to

support the house concept depicted therein, that act simply does not constitute copyright infringement.  Use of a copyrighted work, when that use does not involve copying, does not infringe.  See Jones, 858 F.2d at 280.

B.  Counts V, VI, and VII

VTW argues that it is entitled to judgment as a matter of law on Timberpeg's state law claims for unjust enrichment (Count V), unfair competition (Count VI), and violation of the New Hampshire Consumer Protection Act (Count VII).  According to VTW, all three claims are pre-empted by section 301 of the Copyright Act because none alleges any wrongful act other than unlawful copying of its copyrighted plans.  In the alternative, VTW argues that if Timberpeg's copyright claim is dismissed, the state law claims should also be dismissed due to Timberpeg's failure to adequately allege damages sufficient to meet the $75,000 jurisdictional limit.  Timberpeg "concedes that, to the extent its state law claims create only rights equivalent to those provided by the copyright statute, those claims are preempted," (Def.'s Mem. of Law at 24), but argues that summary judgment on defendant's preemption theory is premature in that its state law

21

claims would provide an alternate avenue of relief should Timberpeg lose on its copyright infringement claim. Timberpeg further argues that the record as developed, and the reasonable inferences drawn from that record, support a finding that its unfair competition, and consumer protection act claims are based upon alleged wrongdoing separate from the conduct that underlies its copyright infringement claim.

The preemption provision of the Copyright Act provides, in pertinent part:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a). As the court of appeals for this circuit has explained:

Section 301(a) precludes enforcement of any state cause of action which is equivalent in substance to a federal copyright infringement claim. <u>See generally</u> <u>Gates Rubber Co. v. Bando Chem. Indus., Ltd.</u>, 9 F.3d 823, 846-47 (10th Cir. 1993); <u>Trandes Corp. v. Guy F. Atkinson Co.</u>, 996 F.2d 655, 658-60 (4th Cir.), cert. denied, 510 U.S. 965 (1993); 1 NIMMER § 1.01[B][h], at 1-35 to 1-36.1. Courts have developed a functional test to assess the question of equivalence. "[I]f a state cause of action requires an extra element, beyond mere copying, preparation of derivative works, performance, distribution or display, then the state cause of action is qualitatively different from, and not subsumed within, a copyright infringement claim and federal law will not preempt the state action." <u>Gates Rubber</u>, 9 F.3d at 847 (citing <u>Computer Assocs. Int'l, Inc. v. Altai, Inc.</u>, 982 F.2d 693, 716 (2nd Cir. 1992)).

<u>Data Gen. Corp. v. Grumman Sys. Support Corp.</u>, 36 F.3d 1147, 1164 (1st Cir. 1994) (footnote and parallel citations omitted).

### 1. Count V (Unjust Enrichment)

In Count V, Timberpeg asserts that VTW is liable for unjust enrichment because "[b]y tracing, digitizing, copying and/or otherwise utilizing the Plans, Vermont Timber saved considerable cost in its manufacture of construction materials for the Isbitski House." (Am. Compl. ¶ 59.) According to the leading treatise in the field of copyright law, "a state law cause of

23

action for unjust enrichment or <u>quasi</u> contract should be regarded as an 'equivalent right' and hence, pre-empted."  1 NIMMER, <u>supra</u>, § 1.01[B][1][g].  As Count V alleges no conduct other than copying, and Timberpeg suggests no additional element necessary to prove its unjust enrichment claim, that claim is deemed preempted by the Copyright Act.


### 2.  Count VI (Unfair Competition)

In Count VI, Timberpeg asserts that VTW is liable for unfair competition because "[w]ithout Timberpeg's consent or approval, Vermont Timber used the Plans to manufacture, sell, and construct a timber frame for the Isbitski House" (Am. Compl. ¶ 67), and did so "even though the Plans bear Timberpeg's name and copyright reservation" (Am. Compl. ¶ 68).  In its complaint, Timberpeg does not specify any particular theory of unfair competition and alleges only a single act of wrongdoing by VTW, its alleged use of the second set of preliminary plans to design and build the timber frame it sold to Isbitski.  According to Nimmer:

> [C]rucial to liability under a deceptive trade
> practices cause of action is the element of
> misrepresentation or deception, which is no part of a

24

cause of action for copyright infringement. Thus, there is no pre-emption of the state law of fraud, nor of the state law of unfair competition of the "passing off" variety. If A claims that B is selling B's products and representing to the public that they are A's, that is passing off. If, by contrast, B is selling B's products and representing to the public that they are B's, that is not passing off. A claim that the latter activity is actionable because B's product replicates A's, even if denominated "passing off," is in fact a disguised copyright infringement claim, and hence pre-empted.

1 NIMMER, supra, § 1.01[B][1][e].

As pled, Count VI is unquestionably of the "B selling B's products as B's own" variety, and is, therefore, deemed preempted. Presumably in an attempt to avoid judgment, Timberpeg asserts, in its objection to summary judgment, that

a jury could infer that VTW knew that it was drawing a frame from Timberpeg's architectural plans (or was willfully blind to that fact), and allowed Isbitski to place those plans on file at the Salisbury Building Department for purposes of obtaining a building permit, without ever correcting the record or taking any other steps to insure that the general public, to whom the files of the Salisbury Building Inspector are open and available, did not think that VTW's work was really that of Timberpeg.

25

(Pls.' Mem. of Law at 25.)  The only affirmative act that Timberpeg identifies, filing the second set of preliminary plans with the Salisbury Building Department, was performed by Isbitski, not VTW,[6] and Timberpeg identifies no legal theory under which VTW had a duty to prevent Isbitski from filing his Timberpeg plans.[7]  Moreover, even if VTW had placed the Timberpeg plans on file, those plans could not, as a logical matter, play any part in the "passing off" of VTW's timber frame as a Timberpeg product because the Timberpeg plans did not include any frame drawings, and VTW designed, manufactured, and sold nothing but a timber frame.  Timberpeg's argument might be stronger if VTW had filed a set of frame drawings authored by Timberpeg, but as it is, the Timberpeg plans on file in the Salisbury town offices include no frame drawings and, therefore, literally say

---

[6] In response to an interrogatory propounded by Timberpeg, VTW stated: "VTW had no dealings with the Town of Salisbury." (Def.'s (second) Mot. Summ. J. (document no. 44), Ex. 31.)

[7] Because Timberpeg alleges no conduct by VTW that could be understood as marketing, Timberpeg's claim is substantially different from the unfair competition claim that was determined not to be preempted in Intown Enterprises, Inc. v. Barnes, 721 F. Supp. 1263, 1267 (N.D. Ga. 1989) (citing Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes, Inc., 785 F.2d 897, 914 (11th Cir. 1986); B.H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254, 1263 (5th Cir. 1971) (unfair competition claim goes to marketing, not copying)).

nothing about the source of the frame that VTW built.  Because Count VI, even as recast in Timberpeg's objection to summary judgment, does not describe a viable claim for "passing off," Count VI is deemed preempted by the Copyright Act.


3.  Count VII (Consumer Protection Act)

In Count VII, Timberpeg asserts that VTW violated New Hampshire's Consumer Protection Act ("CPA"), N.H. REV. STAT. ANN. ("RSA") § 354-A, "[t]hrough its willful, unlawful copying and use of Timberpeg's Plans" which constituted "unfair or deceptive conduct toward Timberpeg."  (Am. Compl. ¶ 71.)


To the extent Timberpeg asserts a CPA claim arising out of VTW's alleged copying of the second set of preliminary plans, that claim is preempted by the Copyright Act.  Timberpeg attempts to create an extra element by asserting that:

> [f]rom the chronology of Isbitski events, a jury could
> infer that VTW met with Isbitski, became aware he was
> also dealing with Timberpeg, an admitted competitor,
> discussed design changes with him, sent him back to
> Timberpeg to have design changes incorporated into his
> architectural plans, and then used those architectural

27

> plans to draw a frame, knowing Timberpeg's business
> included design and erection of timberframes.

(Pls.' Mem. of Law at 25.)  In Timberpeg's view, the foregoing conduct "would certainly 'attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.'" (Pls.' Mem. of Law at 25 (quoting <u>Barrows v. Boles</u>, 141 N.H. 382, 390 (1996).)  Presumably, Timberpeg is now arguing that the "extra element" that gives it a CPA claim is "rascality."

Timberpeg's argument, however, is foreclosed by <u>Data General</u>, in which the court of appeals noted:

> Not every "extra element" of a state claim will
> establish a qualitative variance between the rights
> protected by federal copyright law and those protected
> by state law.  For example, a state claim of tortious
> interference with contractual relations may require
> elements of awareness and intentional interference not
> necessary for proof of copyright infringement.  And
> yet, such an action is equivalent in substance to a
> copyright infringement claim where the additional
> elements merely concern the extent to which authors and
> their licensees can prohibit unauthorized copying by
> third parties.  <u>Harper & Row, Publishers, Inc. v.
> Nation Enters.</u>, 723 F.2d 195, 201 (2d Cir. 1983), <u>rev'd
> on other grounds</u>, 471 U.S. 539 (1985).  Similarly, a
> state law misappropriation claim will not escape

28

> preemption under Section 301(a) simply because a plaintiff must prove that copying was not only unauthorized but also "commercial[ly] immoral[,]" a mere "label attached to [the same] odious business conduct." <u>Mayer v. Josiah Wedgwood & Sons, Ltd.</u>, 601 F. Supp. 1523, 1535 (S.D.N.Y. 1985).

36 F.3d at 1164-65 (parallel citations omitted). Here, Timberpeg has identified no facts – except allegedly suspicious timing – from which a jury could speculate that VTW might have sent Isbitski back to Timberpeg. But even assuming that VTW did send Isbitski back to Timberpeg to collect plans for it to copy, that alleged rascality amounts to no more than the commercial immorality identified in <u>Data General</u> as a "mere label" rather than an extra element of a cause of action. In other words, Timberpeg's CPA claim of copying "with rascality" is preempted by the Copyright Act.

To the extent Count VII asserts a CPA claim based upon VTW's use of the second set of preliminary plans, Timberpeg faces an even more fundamental problem. Specifically, VTW's alleged use of Timberpeg's copyrighted plans does not constitute "trade" or "commerce" as those terms are defined for purposes of the CPA. The CPA prohibits the use of "any unfair method of competition or

29

any unfair or deceptive act or practice in the conduct of any

<u>trade or commerce</u> within this state." RSA 358-A:2. In turn,

> "[t]rade" and "commerce" shall include the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state.

RSA 358-A:1, II. "Although the Consumer Protection Act 'is a comprehensive statute whose language indicates that it should be given broad sweep . . . it is not unlimited in scope." <u>Hughes v. DiSalvo</u>, 143 N.H. 576, 578 (1999) (quoting <u>Roberts v. Gen. Motors Corp.</u>, 138 N.H. 532, 538 (1994)). Where, as here, a plaintiff identifies no conduct on the part of the defendant that involves the advertizing or distribution of goods or services, the CPA does not apply. And, of course, Timberpeg's failure to identify any conduct that qualifies as trade or commerce explains why VTW's allegedly wrongful act, using Timberpeg's plans, bears no resemblance to any of the unlawful acts listed in RSA 358-A:2, I-XIV, another reason why Timberpeg's CPA claim fails. In short, "[t]he purpose of the [Consumer Protection] Act 'is to ensure an equitable relationship between consumers and persons engaged in

30

business,'" <u>Hughes</u>, 143 N.H. at 579 (quoting <u>McGrath v. Mishara</u>, 434 N.E.2d 1215, 1222 (Mass. 1982)), and Timberpeg has identified no way in which it is an aggrieved consumer, nor has it identified any other consumer who was harmed by VTW's use of the Timberpeg plans.

## Conclusion

For the reasons given, VTW's motion for summary judgment on Counts II, V, VI and VII (document no. 23) is granted. Accordingly, Timberpeg's cross motion for summary judgment on the issue of copying as it relates to Count II (document no. 25) is denied, and VTW's motion to strike (document no. 29), motion for judgment on the pleadings (document no. 33), and second motion for summary judgment (document no. 44) are all moot.

Because VTW has prevailed on all counts, it is entitled to entry of judgment in its favor. Furthermore, because the VTW shop drawings are not copies of Timberpeg's copyrighted second set of preliminary plans, and do not constitute a substantially similar infringing copy, Friant cannot be liable for copyright

31

infringement and is, on that basis, entitled to judgment as a matter of law on Count VIII.

All that remains of this case, if anything, are the three claims against Isbitski - Counts I, III, and IV. Isbitski's status in this case is somewhat difficult to determine, as plaintiffs filed a voluntary stipulation of dismissal against him, but subsequently filed an amended complaint that included the same three counts against him. While Isbitski appears to be a named party in this case, it seems unlikely that plaintiffs intended to reinstitute identical claims against him, given their previous stipulation of dismissal. Rather, inclusion of Isbitski in the amended complaint was, in all likelihood, a clerical error and will be treated as such, unless counsel advises the court differently within ten (10) days of the date of this order. Accordingly, the claims against Isbitski are dismissed without prejudice.

The Clerk shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

                                                                          _____
                                                                          Steven J. McAuliffe
                                                                          Chief Judge

February 9, 2005

cc:   W. E. Whittington, IV, Esq.
        Daniel E. Will, Esq.